# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

**ELIZABETH L. PERRIS**
CHIEF BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1536

DIANE K. BRIDGE, LAW CLERK
JAMES B. MURPHY, LAW CLERK

March 29, 2007

Joseph Field
Field Jerger LLP
610 SW Alder St., Ste. 910
Portland, OR 97205

Paul R. Bocci, Jr.
385 First St., Ste. 215
Lake Oswego, OR 97034

     Re: <u>O'Hagan v. Von Borstel</u>, Adv. No. 03-3523
         Ruling on Phase 2 of Trial

Dear Counsel:

    The trial in this adversary proceeding has been conducted in two phases. The court entered its ruling on Phase 1 on November 28, 2006. The purpose of Phase 2 of the trial was to account for the assets of the partnership DVB and Sons ("DVB" or "partnership"), and to determine the amount to which plaintiff, as successor in interest to the bankruptcy estate of Carsten von Borstel ("Carsten" or "debtor"), is entitled upon dissolution of the partnership. The purpose of this letter is to give you my ruling on Phase 2.

    The background facts are set out in the ruling on Phase 1. At the close of Phase 1, I determined that debtor was a 50 percent partner of DVB. As relevant to this portion of the trial, debtor's filing of his bankruptcy petition on December 10, 2001 resulted in a dissolution of the partnership. Rather than winding up the partnership, as is required by state law, the other partner, Ted von Borstel ("Ted" or "defendant"), continued to operate the partnership without regard for the dissolution. The issues in this phase of the trial are what value to award to plaintiff for debtor's partnership interest, in light of the fact that the partnership continued in operation after bankruptcy and after a reasonable time for winding up.

ISSUES

1. What is the appropriate methodology for determining the value of the estate's partnership interest?

2.	What was the value of the partnership assets on the relevant date?

                             DISCUSSION

1.	<u>Methodology</u>

   In my ruling on Phase 1 of the trial, I concluded that plaintiff is entitled to 50 percent of the value of the partnership assets as of December 10, 2001, plus compensation for the delay in winding up the partnership. The compensation is either interest on 50 percent of the value of the assets, at 9 percent, starting on April 1, 2002, or one-half of the net custom hire income generated using partnership equipment, plus one-half of the net proceeds from any leaseholds and government payments. I indicated that I would assume that all custom hire income and payments by Pat Powell for services are partnership payments, unless there was competent evidence that the payments were strictly for labor by defendant alone.

   Thus, I first must determine the value of the partnership assets in existence at the time of dissolution, December 10, 2001. Once that value is determined, I agree with defendant that I must subtract the partnership's debts as of that date, in order to calculate the value of the partnership interest to which plaintiff is entitled. According to Exhibit K, the partnership debt as of December 10, 2001 was $149,647.71. That is the amount that I will deduct from the asset value I determine below.

   Plaintiff argues that he is entitled to 50 percent of the present value of the assets of the partnership as of April 1, 2002, plus interest, or to cash flows generated by the partnership after the date of dissolution plus the December 2006 present value of the partnership's assets.

   I already ruled during Phase 1 of the trial that the pertinent date for valuation is December 10, 2001. I did indicate that compensation for the delay in winding up the partnership (interest) would not begin until April 1, 2002, because defendant reasonably could have wound up the partnership by that date. The delay in the commencement of interest does not mean that the valuation date is altered. Further, there is no evidence of which I am aware of the value of partnership assets as of April 2002. As an alternative to interest, I indicated in the ruling on Phase 1 that plaintiff would be entitled to one-half of the net custom hire income generated using DVB equipment

plus one-half of the net proceeds from any leaseholds and government payments. Because I have already determined the methodology, I will not consider the second argument, which entails determining the partnership's income between December 10, 2001 and December 31, 2005 and then adding the value of the assets as of 2006.

2. <u>Value of assets on December 10, 2001</u>

There was evidence of various categories of partnership assets that were in existence on December 10, 2001. I will discuss each category separately.

    A.    <u>Real property</u>

        i.    <u>Ownership interests</u>

In Phase 1 of the trial, I concluded that the partnership did not have any ownership interest in any real property. Plaintiff asks that I reconsider that conclusion with respect to the Home Place. Based on the evidence introduced during both phases of trial, the lack of evidence of any lease by DVB of the Home Place, the inadequacy of defendant's explanations for why DVB reported substantial farming expenses on its tax return after defendant claims that the partnership had ceased farming, and defendant's admission that at least part of those expenses were the result of farming the Home Place, I have concluded that the motion for reconsideration should be granted and that the Home Place is an asset of the partnership.

During Phase 2 of the trial, plaintiff introduced Exhibit 142, which was a Farm and Home Plan signed by defendant on behalf of DVB on July 3, 2003 for calendar year 2003. On page 2 of that document, defendant represented that the Home Place belonged to DVB.[1] On page 4 of that exhibit, defendant stated that during 2003 DVB would receive $21,513 in CRP payments. That is exactly

---

[1] Defendant testified that Exhibit 142 also listed the Bakeoven property on page 2. This is correct, but the value of that property is not included in the net worth computation. As asserted by defendant, it appears that the Bakeoven property is listed because the FSA loans secured by the Home Place were also secured by the Bakeoven property. There are notes next to the Bakeoven listing that Don Phillips bought Bakeoven and that Phillips and Bunch pay the Annual Tax.

the amount of the CRP payments for the Home Place at that time. Exhibit 131.

Defendant attempted to explain away this evidence by indicating that an FSA agent filled out the form and he just signed it. This is at best a weak excuse, but one the court cannot accept, because ownership of the Home Place as represented in Exhibit 142 is consistent with the handling of farming expenses on the DVB tax return. If DVB did not own the real estate, no explanation has been provided for the significant farm expenses reported by DVB.

During Phase 2 of the trial, defendant testified that DVB's farming activities consisted of the following: DVB was not a party to any written or verbal land leases after December 10, 2001. The only farming DVB did in 2002 and 2003 was providing custom hire services to A&K Ranch on 2400 acres. The services ranged from seeding to harvesting and DVB used its combine and two trucks to haul wheat in performing the services. During part of 2003, defendant also provided custom hire services to Pat Powell. Those services have continued to the present. Both defendant and Powell testified that defendant strictly provides labor to Powell; all equipment is supplied by Powell and no DVB equipment is used.

According to the 2004 DVB tax return, Schedule F (Exhibit 27, p. 9), during 2004 DVB incurred $39,757 in farm expenses consisting of the following: custom hire - $9,189; chemicals - $1,098; fertilizer - $1,558; freight and trucking - $1,450; gas - $7,747; repairs - $17,040; and supplies - $1,675. Defendant testified that the $9,189 spent on custom hire expense was for seeding wheat and aerial chemical control on the Home Place. He also testified that the $7,747 spent for gas was for farmwork on the Home Place and possibly some furnace oil. Defendant supplied no explanation regarding how the other expenses could have been incurred if, as he testified, DVB did no farming in 2004.

Defendant testified that he grew wheat on the Home Place in 2004. Defendant's personal tax return for that year (Exhibit 49) reflects none of the farming expenses typically associated with farming wheat, such as seed, chemicals, fertilizer and the like.

The logical conclusion to be drawn from the two 2004 tax returns is that DVB was farming the Home Place in 2004. According to defendant's testimony, DVB did not lease the Home

Place. Thus, defendant's representation to FSA that DVB owned the Home Place explains why DVB would be farming the property and claiming the expenses.

A further evidentiary hearing will be set to determine the value of the Home Place as of December 10, 2001, any indebtedness secured by the Home Place not already included in the partnership debt, and the reasonable costs of sale so that the value of plaintiff's half interest in the partnership equity can be determined.

### ii. Leasehold interests

In my ruling on Phase 1 of the trial, I noted that the partnership's 2002, 2003, and 2004 tax returns all show substantial farming-type expenses, but the partnership had not identified leased property on which the partnership incurred those expenses. I required defendant to demonstrate what leasehold interests DVB had and what farming operations DVB conducted in 2002-2004. As discussed above, during Phase 2 of the trial defendant testified that the partnership did not have any written or oral leases for real property as of December 2001 or thereafter. Plaintiff's listing of assets as of the end of 2001, Exhibit 140 page 7, also does not include any leaseholds. The evidence established that at least some of the farming-type expenses were incurred in farming the Home Place, property I have now concluded belonged to DVB.

I conclude that the evidence does not show that the partnership had any real property leases that were an asset of the partnership as of the date of dissolution.

### B. Personal property

### i. Cash in bank

There is no dispute that the amount in the partnership bank account at the end of December 2001 was $9,129.00. Exhibit 126. The parties appear to have accepted the end-of-month balance as the value of the partnership's cash on December 10, 2001.

### ii. Cash value of life insurance policies

The parties agree that the court may use the value stated in Exhibit 127 as the surrender value of three life insurance

Joseph Field
Paul Bocci
March 29, 2007
Page 6

policies as of February 24, 2006 as the value to the partnership on dissolution. That value is $36,761.53.

      iii. <u>Government payments</u>

As of December 10, 2001, the partnership was party to 10-year Conservation Reserve Program (CRP) contracts for various parcels of land. Those contracts were entered into in 1997 and entitled the partnership to payments over the next 10 years. Exhibits 129, 130, 131, 132, 133.[2] Each contract provided for percentage payments to be split by the partnership and by the property owner. For Contracts 304 and 320 (Exhibits 129 and 131), the partnership share was stated as 0 percent. For Contract 305 (Exhibit 130), the partnership share was 10 percent. Contract 330 (Exhibit 132) provided for a 33.3 percent share to the partnership, and Contract 319 provided for a 25 percent share to the partnership.

Plaintiff argues that the percentage shares provided by these contracts should be adjusted to more accurately reflect the partnership's interest in the payments. These contracts were entered into in 1997, long before Carsten's bankruptcy and this litigation began. They reflect what appears to be an arms-length agreement about the appropriate percentage to be paid to each contracting party. I find no justification for recharacterizing the percentages that were agreed among the parties. Therefore, I will apply the percentages as set out in the contracts. Because Contracts 304 and 320 each provided for a 0 percentage share to the partnership, I will not attribute any value to those contracts for the partnership.

To determine the value to the partnership of the remaining CRP contracts as of the date of dissolution, the present value of the contracts must be determined. That present value calculation was done by Virginia Anderson, an accountant, and set out in Exhibit 135. Anderson applied a 9 percent discount factor. She

---

    [2] Other government programs were also in place and provided some payments after 2001. For example, Exhibit 137 shows a crop disaster relief payment of $28,148 to the partnership in 2003. However, there is no evidence that the partnership had rights to any payments under those programs at the time of dissolution in December 2001. Therefore, they were not assets of the partnership that must be valued.

Joseph Field
Paul Bocci
March 29, 2007
Page 7

then determined the partnership percentage of those present values, and set out those values in Exhibit 140 page 7.

There are three adjustments that I will make to the figures used by Anderson on Exhibit 140 page 7.  First, Anderson included Contracts 304 and 320 in her calculation, which I have said I will not include.

Second, she calculated the partnership's share of CRP payments under Contract 305 at 25 percent rather than the 10 percent provided by the contract.  As I have said, I will not recast the percentages provided by the contracts.  Therefore, I will apply a 10 percent share for the partnership for Contract 305.

Finally, she included the 2001 payments in her present value analysis.  The testimony established that the 2001 CRP payments had already been received by the partnership by the time it dissolved in December 2001.  Therefore, the 2001 payments should not be included in the present value analysis.  I will back out the 2001 payments for each of the three CRP contracts.

According to Exhibit 135 page 2, the present value of Contract 305 was $66,916.50.  Subtracting the 2001 payment of $12,382 leaves a present value for future payments of $54,534.50.  The partnership's 10 percent share of that amount is $5,453.45.

Exhibit 135 page 4 shows that the present value of Contract 330 was $5,497.38.  Subtracting the 2001 payment of $1,080.00 leaves $4,417.38.  The partnership had a right to 33.3 percent of those payments, or $1,470.99.

Exhibit 135 page 5 shows that the present value of Contract 319 was $104,638.26.  Subtracting the 2001 payment of $19,845.00 leaves $84,793.26.  The partnership had a right to 25 percent of those payments, or $21,198.32.

The total present value of the three CRP contracts as of December 10, 2001, was $28,122.76.

Plaintiff seeks to add to that value the value of extensions of the CRP contracts that were entered into in 2006.  There is no evidence that the partnership had any rights to extension that had value as of the date of dissolution, December 10, 2001.  Therefore, I will not include any extension value.

Joseph Field
Paul Bocci
March 29, 2007
Page 8

      iv.   <u>Other personal property</u>

After Phase 1 of this trial, I determined that the partnership owned the personal property identified on the partnership's 2004 tax return. At Phase 2, the parties both relied on the list of property used initially by Jake Cheechov for his valuation. That list apparently was drawn from the 2004 depreciation schedule, because it contained two trucks that the partnership did not yet own in 2001. In valuing the partnership's assets as of the end of 2001, I will not include the two trucks that were acquired after 2001. Therefore, I will use the list compiled from the 2004 depreciation schedule, which was used in Exhibits 128 and M, but will disregard the two post-2001 pickup trucks.

There were two opinions given of the value of the items on the list. The first opinion was provided by Jake Cheechov, an auctioneer and qualified equipment appraiser. Cheechov was hired jointly by the parties, and conducted his analysis based solely on the list provided that had been drawn from the depreciation schedule. He did not view the equipment or have any information about its condition. He gave his opinion of value based on an assumption that the equipment was in fair to good operating condition, that it "exists in a desirable salable condition" and that the items valued had the normal amount of use for the estimated age and condition of the equipment. Exhibit 128 p. 10. His valuation is set out in Exhibit 128 pages 12 and 18, and totals $259,000 as of December 10, 2001.

The second opinion was given by Wayne (Rocky) Webb, who owns an auction sales company in The Dalles, Oregon. He was hired by defendant, and viewed much of the equipment the week of the trial. Based on his 2006 viewing, he set out his opinion of values on Exhibit M, which is Cheechov's list with an additional column for Webb's valuation. Webb included five items that he testified were on the depreciation schedule but had not been on Cheechov's list. His valuation for the supplemented list was $91,036.

In determining the value of each of the listed items, I conclude that I will use Cheechov's 2001 value, unless there is testimony that the equipment or item was in significantly less than the average condition that Cheechov assumed for his valuation. Although Cheechov did not view the equipment or other items, he did provide a 2001 value. Webb, who viewed many of the items, assumed a 2001 auction date in valuing the items on the

Joseph Field
Paul Bocci
March 29, 2007
Page 9

list, but he did not have any information about the condition of the items in 2001. Therefore, his valuation that resulted from his 2006 viewing is less helpful than Cheechov's, who assumed an average condition for the items. I have, however, accepted Webb's valuation of the items he added to the list, except that I have given a scrap value for those items he valued at $0.

Defendant gave extensive testimony about the items on the valuation list. I have relied on that testimony to fill in information about the condition of the listed items in 2001. I have set out the values in a chart, below, in which I show Cheechov's 2001 valuation, Webb's valuation, and my conclusion about the value of each item. The chart is drawn from Exhibits 128 and M. Certain items fit into categories, which I have indicated with a legend. There were many items that require individual explanations about my valuation conclusion; those explanations follow.

I will first make some preliminary comments. The two appraisers differed in their view about the scrap metal value for items that were not usable. Cheechov assigned a scrap value of either $500 or $250, depending on the item, testifying that the location of some items could make it uneconomical to transport the items to a scrap market. Webb assigned $0 to items that he considered to be scrap, testifying that, although there is a market for scrap if it is delivered to Portland, transportation costs often negate any scrap value.

I conclude that, for items that have only scrap value, that value is half of the scrap value assigned by Cheechov, which means either $250 or $125, depending on the item. I make that conclusion based on the likelihood that some items are in locations where transportation to a scrap metal market would result in economic value, while other items are widely scattered among ranches and transporting them to market would cost more than they are worth.

Defendant testified that some items were not operating in December 2001 and were not repairable. For those items, I have assigned a scrap value.

Other items were not usable in 2001, and Cheechov, even assuming average condition for the particular item, had assigned scrap value. For those items, I also assign a scrap value.

Joseph Field
Paul Bocci
March 29, 2007
Page 10

Defendant testified that many items were not operable in December 2001. That testimony establishes that they were in significantly below the average condition Cheechov had assumed. For most of those items, there was no evidence about whether they could be repaired; the only evidence was that they were not operable. Because of the lack of evidence about the feasibility of repair, I conclude that those items will be valued at one-half the value assigned by Cheechov, to account for the fact that they were in below average condition but were not necessarily incapable of repair and likely had some value beyond scrap value.

The following are my preliminary comments about the valuation of specific items on the chart below:

<u>New Holland Back Hoe</u>: The back hoe was purchased at auction in 2001 for $24,000. It was placed in service on October 17, 2001, less than two months before the partnership dissolved. There was no explanation for reducing the value substantially during the same year as the purchase. Cheechov testified that, had he known the back hoe had been purchased at auction in 2001 for $24,000, that would have changed his valuation, because the amount paid at an auction is the value of the item. Therefore, I value the back hoe at $24,000.

<u>1993 Versatile 835 4x4 Tractor</u>: Cheechov valued this item based on the assumption that it was a 1993 model. In fact, it was actually a 1984 model. Therefore, Webb's valuation, which he based on extensive wear and tear, is more accurate.

<u>Case Wheel Tractor</u>: This was a 1951 model tractor. Although there was testimony that it had not been used for 10 years before 2001, there was no evidence that it was not useable. Therefore, I will use Cheechov's valuation, which is based on the average condition for the particular item.

<u>Early 70s Versatile 4x4</u>: This item last ran in 1990 and then was parted out. Therefore, I will assign a scrap value of $250.

<u>TD Dozer</u>: This is a 1961 model. The testimony was that it was not running when purchased, but was purchased with the intent to repair it. Once the actual condition was known, it never was repaired. I will assign it a scrap value of $250.

<u>International Truck (1979)</u>: Webb, who saw the truck in 2006, valued it at $1,000, which was higher than the $500 scrap value

Joseph Field
Paul Bocci
March 29, 2007
Page 11

given by Cheechov. I conclude that, if it was worth $1,000 in 2006, it was worth at least that in 2001.

(7) Mid-70s Farm Pickups: Cheechov valued the seven pickups at $3,500, or $500 each. Defendant testified that four of the pickups were no longer running in 2001. I will assign no value for those four. He testified that one was operational; there was no testimony about the others. I will assign $500 for the one pickup that was operational and $500 each for the other two, which I assume in the absence of evidence to the contrary were operational in 2001.

80 Jeep J20: The testimony was that this Jeep was not operational in 2001; it had had an engine fire. I will assign it a value of $1,000. There was no evidence that the engine could not be replaced.

Hopper Bed - Semi: The testimony was that this item was usable but in need of repair in 2001; therefore, I will use the lower Webb valuation.

JD Mower: Webb saw this equipment in 2006 and valued it at $750, compared to the $500 scrap value given by Cheechov. If the mower was worth $750 in 2006, it was likely worth at least that in 2001. I assign a $375 value for the partnership's 1/2 interest.

Sunflower Cultivator: This item was purchased at auction in April 2001 for $4,000. There is no explanation for a $1,500 value in light of the $4,000 purchase price less than one year before the partnership's dissolution. Therefore, I will assign a $4,000 value to the cultivator.

Grain Treater Cleaner: The testimony was that this item was very old and not operational. The item was wooden, so I will not assign a scrap metal value.

3 grain augers: According to the testimony, there was only one grain auger left in December 2001. Cheechov had valued the three at $3,500, or $1,167 a piece. Therefore, I value the remaining one at $1,167.

110 Powder River Panels/Corrals: The testimony was that some of these panels were no longer in the partnership's possession as of December 10, 2001, but that some were still there and in use. Webb saw the existing panels, and valued them at $4,550. I will

Joseph Field
Paul Bocci
March 29, 2007
Page 12

use his valuation, as he had the opportunity to see the ones that remained.

   F350 Bumper: This item is valued at $0, based on the testimony that the bumper had been put on the 2000 pickup truck and remained there. The partnership still had the pickup in 2001, and it is on the equipment list.

   Computer: DVB purchased the computer for $3,079 on May 2, 2001, approximately 7 months before DVB's dissolution. Cheechov's $500 valuation is more believable than Webb's $100 value. It is unlikely that the computer lost approximately 97% of its value in less than one year.

   (3) Sprayers: Cheechov valued the sprayers at $5,000, or $1,667 each. The testimony established that one of the sprayers was not usable in December 2001; I will value that sprayer at 1/2 of Cheechov's value, for a value of $833. The second sprayer was purchased in 2000 for $400. I will use that purchase price as the value for that sprayer. The third sprayer I will value at Cheechov's valuation, in the absence of any other evidence about condition.

   Bulls: Defendant testified that, as of December 10, 2001, the partnership owned only two bulls. Cheechov had valued the bulls at $750 each. Therefore, I value the two existing bulls at $1,500.

   Heifers: Defendant testified that, as of that same date, the partnership had 18 heifers, not 24. At Cheechov's valuation of $600 each, the total for the 18 heifers is $10,800.

   Cows: Instead of 10 cows, defendant testified that the partnership had 16 cows, which Cheechov had valued at $450 each, for a total of $7,200 for the cows.

   Horses: Defendant testified that, by December 2001, the partnership no longer owned any horses.

   F150 Ford Pickup (1996) and Calkins Rod Weeder: These are items added by Webb that were not valued by Cheechov. The only evidence of value was that assigned by Webb. Therefore, I will use Webb's valuation.

   The following chart sets out the court's conclusions about value. I have added actual model years or other correcting

Joseph Field
Paul Bocci
March 29, 2007
Page 13

information in parentheses for items to which the information relates.

LEGEND:

(1) Item not operating or usable in December 2001, but no evidence that item was not repairable. Assign one-half of Cheechov's value to adjust for below average condition

(2) Item disposed of before December 2001

(3) Item operable in December 2001 but needed major repair

(4) Scrap value

(S) Scrap value assigned by Cheechov

| Item Description | Cheechov valuation (2001) | Webb valuation | Court value |
|---|---|---|---|
| **TRACTORS** | | | |
| New Holland Back Hoe (1996) | 16,000 | 16,000 | 24,000 |
| Case 1660 Combine (1986) | 32,000 | 8,000 | 32,000 |
| 1993 Versatile 835 4x4 Tractor (1984) | 25,000 | 5,000 | 5,000 |
| AC Tractor (1982) | 6,000 | 0 | 3,000 (1) |
| 1981 Steiger 4x4 Tractor (1979) | 16,000 | 0 | 8,000 (1) |
| 1982 Steiger 4x4 Tractor (1976) | 16,000 | 0 | 8,000 (1) |
| Case Wheel Tractor (1951) | 1,000 | 0 | 1,000 |
| Early 70s Versatile 4x4 | 8,500 | 0 | 250 |
| TD 20 Dozer (1960 or 1962) | 5,000 | 0 | 250 |
| TD 20 Tractor (1964) | 5,000 | 1,500 | 1,500 (3) |

Joseph Field
Paul Bocci
March 29, 2007
Page 14

| Item Description | Cheechov valuation (2001) | Webb valuation | Court value |
|---|---|---|---|
| **VEHICLES** | | | |
| 2000 Ford F350 Pickup | 20,000 | 20,000 | 20,000 |
| 1980 International Truck (1/2 interest) | 5,000 | 1,250 (1/2 int) | 2,500 |
| 2003 Ford F350 Pickup | N/A | N/A | N/A |
| 1943 GMC Truck w/Box | 500 (S) | 0 | 0 (2) |
| 1950 Chevrolet Truck w/Box | 500 (S) | 0 | 0 (2) |
| 1964 International 4x4 Truck (1965) | 500 (S) | 0 | 0 (2) |
| International Fuel Truck (1955) | 500 (S) | 0 | 250 (4) |
| International Flatbed Truck (1960) | 500 (S) | 0 | 250 (4) |
| International Truck (1979) | 500 (S) | 1,000 | 1,000 |
| (7) Mid 70s Farm Pickups | 3,500 | 0 | 1,500 |
| Semi Truck (1972) | 5,500 | 0 | 0 (2) |
| 80 Jeep J20 | 2,500 | 0 | 1,000 |
| 73 Jeep (AMC) | 1,000 | 0 | 500 (1) |
| Motorcycle | 500 (S) | 0 | 250 (4) |
| 92 Chevy Pickup (purchased 2002) | N/A | N/A | N/A |
| Horse Trailer | 1,500 | 0 | 0 (2) |
| Hopper Bed - Semi (1980) | 3,500 | 2,500 | 2,500 (3) |
| Trailer | 1,500 | 0 | 1,500 |
| **FARM IMPLEMENTS** | | | |
| JD Mower (1/2 interest) | 500 (S) | 375 (1/2 int) | 375 |

Joseph Field
Paul Bocci
March 29, 2007
Page 15

| Item Description | Cheechov valuation (2001) | Webb valuation | Court value |
|---|---|---|---|
| (2) Case 3 Bottom Plows | 250 (S) | 0 | 0 (2) |
| Graham Plow | 500 (S) | 0 | 0 (2) |
| JD Rod Weeders | 250 (S) | 0 | 0 (2) |
| Wheat Treater | 250 (S) | 0 | 125 (4) |
| Drill Mover | 250 (S) | 0 | 0 (2) |
| Sunflower Cultivator | 1,500 | 1,500 | 4,000 |
| Hay Chopper | 250 (S) | 0 | 125 (4) |
| Grain Treater Cleaner | 250 (S) | 0 | 0 |
| (3) Grain Augers | 3,500 | 250 | 1,167 |
| 8 Section Skew Treader | 500 (S) | 0 | 0 (2) |
| Large Dry Land Disc (1982) | 12,000 | 3,000 | 12,000 |
| Irrigation System | 2,500 | 0 | 0 (2) |
| Springtooth Harrow | 2,500 | 0 | 0 (2) |
| Spike Tooth Harrow | 500 (S) | 0 | 0 (2) |
| Foster Cart - 3 Blowers | 2,500 | 0 | 0 (2) |
| Calkins 12' Rodweeders | 1,500 | 0 | 750 (1) |
| **MISC. EQUIPMENT** | | | |
| Approx. 110 Powder River Panels/Corrals | 8,250 | 4,550 | 4,550 |
| 3 Wheeler | 500 (S) | 0 | 250 (4) |
| F350 Bumper | 1,500 | 0 | 0 |
| Steel Drums | 250 (S) | 0 | 0 (2) |
| 1000 Gallon Gas Tank | 350 | 50 | 350 |
| 1000 Gallon Diesel Tank | 350 | 75 | 350 |
| Oxygen-Acetylene Torch | 150 | 100 | 150 |

Joseph Field
Paul Bocci
March 29, 2007
Page 16

| Item Description | Cheechov valuation (2001) | Webb valuation | Court value |
|---|---|---|---|
| Computer | 500 | 100 | 500 |
| Welder | 1,500 | 500 | 1,500 |
| (3) Sprayers | 5,000 | 1,000 | 2,900 |
| Spray Tank | 1,500 | 0 | 0 (2) |
| (2) Air Compressors | 750 | 0 | 750 |
| **LIVESTOCK** | | | |
| 10 Bulls (2 bulls) | 7,500 | 1,500 | 1,500 |
| 24 Heifers (18 heifers) | 14,400 | 9,450 | 10,800 |
| 10 Cows (16 cows) | 4,500 | 8,336 | 7,200 |
| 2 Horses (0 horses) | 1,000 | 0 | 0 (2) |
| **ITEMS INCLUDED ON WEBB LIST BUT NOT ON CHEECHOV LIST** | | | |
| Trap Wagon | | 0 | 250 (4) |
| Foster Cart | | 0 | 250 (4) |
| International Truck | | 0 | 250 (4) |
| F150 Ford Pickup (1996) | | 3,500 | 3,500 |
| Calkins Rod Weeder (Item #186) | | 1,500 | 1,500 |
| **TOTAL** | 255,500 | 91,036 | 169,342 |

    This total asset value must be reduced by the cost of sale. That is because, had the partnership been wound up and the assets liquidated at the time debtor filed his bankruptcy petition, there would have been sales costs incurred. Further, if defendant chooses not to pay for the value of the partnership assets and instead allows them to be sold, there will be costs associated with that sale. Cheechov testified that, if he were to conduct a sale of these items, he would charge 10 percent plus all expenses. Based on the testimony that these items are widely scattered, there would be transportation costs for gathering the

items for sale. Webb testified that the cost of conducting an auction of this list of property would be 15 percent for his commission plus expenses, for a total of 20-25 percent. I conclude that the value of the assets should be reduced by 20 percent for the costs of sale. $169,342 less 20 percent ($33,868.40) equals a value to the partnership of the personal property of $135,474.

    C.   <u>Total value of partnership assets as of December 10, 2001</u>

Adding the values for each of the categories above gives a total asset value for those assets of $209,487.29. From that amount I deduct the amount of debt owed by the partnership as of the dissolution date, which is $149,647.71. Exhibit K. Therefore, plaintiff is entitled to 50 percent of the remainder of $59,839.58, which totals $29,920. Plaintiff will also be entitled to 50 percent of the value of the Home Place as of December 10, 2001, after that value is determined in Phase 3 of the trial.

3.   <u>Net custom hire income plus net proceeds from leaseholds and government payments</u>

As I have already held, in order to compensate for the delay in payment, plaintiff may choose to receive either 9 percent interest on his share of the partnership value, or one-half of the custom hire income generated using partnership equipment plus one-half the net proceeds from any leaseholds and government payments. I have already determined that the evidence did not establish that the partnership had any leaseholds as of the date of dissolution. I also conclude that I have already included the present value of the CRP payments in the partnership asset value. Therefore, it would not be appropriate to allow plaintiff to receive half of the CRP payments in addition to the asset value, which already includes the CRP payments.

That leaves the net custom hire income generated by use of DVB equipment. In my ruling on Phase 1, I indicated that I would assume that all custom hire income and payments by Pat Powell for services would be considered partnership income, unless there was competent evidence that the Powell payments were strictly for labor by defendant alone.

Joseph Field
Paul Bocci
March 29, 2007
Page 18

Powell testified at trial that, since late 2003, defendant has worked for him as a general farm laborer.[3] Originally, the checks he wrote for defendant's services were made out to the partnership. Then, defendant asked that the checks be made out to defendant personally. Powell testified that defendant uses only Powell's equipment in defendant's work for Powell.

Defendant testified that he farmed the A&K Ranch in 2002 and went to work for Powell in September 2003. He testified that he used some partnership equipment during the harvest season of 2002 and 2003, and that he used Powell's equipment for the work he did for Powell. He also testified that he used some partnership equipment, a Versatile tractor and the sunflower cultivator, on the Home Place in the spring of 2004.

I conclude that defendant was engaged in partnership activity when he farmed the A&K Ranch until September 2003, but that after that, his work was as an individual for Powell. It is impossible to precisely calculate the net custom hire income from the accounting information supplied. Exhibit 140 contains detailed information regarding DVB's income and expenses. During 2002 and 2003, the gross custom hire income was $96,507 (Exhibit 140, p. 3) and $77,365[4] (Exhibit 140, p. 4) respectively. It is impossible to precisely allocate expenses between custom hire and other sources of income. The only way to do so is to allocate on a percentage basis. In both 2002 and 2003, custom hire income was 47% of the total DVB income. Allocating 47% of the expenses

---

[3] Defendant's testimony varied slightly from Powell's regarding when the labor relationship started. Defendant testified that he went to work for Powell in mid to late 2003, but that he did not work for him from mid-October through the end of 2003, because he was moving from Bakeoven to Grass Valley during that time.

[4] The 2003 custom hire income may include some payments by Powell, but there is no evidence from which I can calculate the amount. Defendant testified that Powell paid $3,000 per month for his services, but as discussed in note 3 above, it is unclear how many months defendant worked for Powell during 2003. The burden was on defendant to supply the necessary evidence regarding the details of the Powell relationship. His failure to provide evidence regarding how much of DVB's custom hire income in 2003, if any, was from Powell prevents me from reducing the 2003 custom hire income for payments from Powell.

Joseph Field
Paul Bocci
March 29, 2007
Page 19

each of those years to custom hire and excluding depreciation
(because it is a non-cash expense) results in custom hire
expenses of $78,962 in 2002 and $52,939 in 2003.[5] Thus, the 2002
net custom hire income was $17,545 and the 2003 net custom hire
income was $24,426, for a total of $41,971.

Plaintiff is entitled to only one-half of that portion of
the partnership income that was generated using partnership
equipment. Defendant's testimony was that the use of partnership
equipment was negligible. However, in light of the evidence that
the partnership paid substantial amounts for repairs during 2002
and 2003, it seems most likely that partnership equipment was
being used to generate the income. Therefore, I conclude that
the net custom hire income generated by the partnership during
those two years was through the use of partnership equipment.
Plaintiff is entitled to one-half of that income, or $20,986, if
he chooses income as an alternative to interest.

CONCLUSION

Plaintiff's share of the partnership is $29,920 plus one-
half the net equity in the Home Place on December 10, 2001. The
court will set a further evidentiary hearing to hear the evidence
necessary to calculate the Home Place net equity.

In addition, as compensation for the delay in the winding up
of the partnership, plaintiff is entitled to either 9% interest
on the above sum or one-half the net custom hire income generated
for the partnership, which is $21,986. Once plaintiff has made
his election, defendant will be provided an opportunity to pay
the pertinent amount to plaintiff, thereby entitling him to
retain the partnership assets for himself. If he chooses not to
do that, the assets will be sold. Plaintiff will be paid his
share as calculated above. Any deficiency in the value obtained
will be entered as a money judgment against defendant.

---

[5] These computations do not accept the reallocation of
operating expenses contained on Exhibit 140, pp. 3 and 4. In
examining the different types of income reflected on DVB's and
defendant's income columns on those pages, it is apparent that
the operating expenses are likely to be different. Thus, the
across-the-board percentage allocation of operating expenses made
by the accountant is not supported by the evidence.

Joseph Field
Paul Bocci
March 29, 2007
Page 20

    Plaintiff should submit an order consistent with this ruling, which shall provide that the value of the Home Place will be determined in Phase 3 of the trial.

                                Very truly yours,

                                ELIZABETH L. PERRIS
                                Bankruptcy Judge